# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

# BECKLEY DIVISION

MATTHEW PEASLEE,

                Plaintiff,

v.                                                                    CIVIL ACTION NO. 5:16-cv-11133

CITIZENS CONSERVATION CORPS, INC.,

                Defendant.

## MEMORANDUM OPINION AND ORDER

The Court has reviewed the *Defendant Citizens Conservation Corps, Inc.'s Motion for Summary Judgment* (Document 45) and *Memorandum of Law in Support* (Document 46), the *Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment* (Document 47), and the *Defendant's Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment* (Document 48). For the reasons stated herein, the Court finds that the motion should be granted in part and denied in part.

## FACTS

The Plaintiff, Matthew Peaslee, was employed by Defendant Citizens Conservation Corps, Inc. (CCC) from February 2012 until June 2016. CCC operates courtesy patrol vehicles in West Virginia. Mr. Peaslee was initially hired as a relief supervisor, to fill in when other supervisors were unavailable. He was quickly promoted to a supervisor position in May 2012. He worked from home in both positions.

Mr. Peaslee is a disabled veteran and suffers from Post-Traumatic Stress Disorder (PTSD), as well as knee problems. He explained that his PTSD makes it "hard for me to be in public places; it's hard for me to take my kids somewhere to do something in public; I'm constantly on edge when I'm out and about; and I have a hard time with crowds and having my back to people." (Peaslee Depo. at 174::4-8) (Document 48-1.) Mr. Peaslee's direct supervisor at CCC, Ed Cornett, and another management employee, John Ferrell, were veterans, and Mr. Peaslee first told them about his PTSD during a conversation about military service early in his employment. Mr. Peaslee stated that he talked about his PTSD in subsequent conversations with Mr. Cornett and Mr. Ferrell as well. Mr. Peaslee also reported telling Tim Pack, another manager, about his PTSD during a conversation about a harassment conviction that Mr. Pack discovered in Mr. Peaslee's background check.[1] All three told Mr. Peaslee to let them know if he needed anything related to his PTSD. Mr. Peaslee did not, however, list his PTSD on an "Emergency Information" form that included a section for employees to list medical information, including chronic conditions.

Mr. Peaslee had regular medical appointments for PTSD treatment from the beginning of his tenure at CCC. His PTSD had been improving early in his employment, but worsened after an incident in 2014 in which a friend of his (now ex) wife shot at him. At some point, his doctor recommended prolonged exposure therapy, with appointments at the same time every week. He informed Mr. Cornett of his appointments about a week in advance, either verbally or via email, and explained the schedule for the exposure therapy prior to beginning the program. At the time, Mr. Cornett said it would not be a problem. Although Mr. Peaslee worked from home and his work hours were flexible, he testified that Mr. Cornett often scheduled meetings or other tasks

---

1 All managers and officials at CCC deny any knowledge of Mr. Peaslee's PTSD prior to his termination.

requiring his attendance at the same time as his medical appointments, forcing him to cancel or postpone his therapy, both before and after he began the exposure therapy. When Mr. Peaslee tried to say he was unavailable because of his doctor's appointments, Mr. Cornett "would guilt [him] into canceling the doctor's appointment to go do whatever it is that he needed done." (Peaslee Depo. at 90::9-11) (Document 47-2.) Mr. Peaslee said he was pressured to cancel his appointments about every two weeks, and the frequency increased towards the end of his employment. Mr. Cornett also objected to a three-day absence following a neck injury in 2016. Mr. Peaslee submitted a doctor's note to HR, and the absence was excused.

Mr. Peaslee spoke with the Chief Operating Officer, Jennifer Douglas, about Mr. Cornett's last-minute schedule changes that interfered with the prolonged exposure therapy and she replied with "Well, sometimes we just have to cancel our appointments and…get over it." (Peaslee Depo. at 75::6-9) (Document 47-2.) An HR consultant, Jen Brown, assured Mr. Peaslee that he could attend doctors' appointments, but Mr. Cornett's behavior did not change. On May 14, 2016, Mr. Peaslee sent Mr. Cornett an email, stating that he attempted to schedule doctor appointments to avoid interference with work obligations, but refusing to provide a list of doctors' appointments because "[i]n the past when I have given you my appointments you have made it impossible for me to attend those appointments with last minute 'emergencies.'" (May 14, 2016 Email, M. Peaslee to E. Cornett) (Document 47-8.)

Mr. Cornett also asked questions about Mr. Peaslee's medical conditions that he found overly invasive, such as asking what medications were prescribed, why he had appointments, what symptoms he was having, or who his doctor was. Mr. Cornett did not indicate that he needed the information for HR paperwork or to consider Family and Medical Leave Act (FMLA) coverage;

3

his responses when Mr. Peaslee expressed discomfort with the questions suggested that he was simply curious. Mr. Peaslee complained to Ms. Brown about Mr. Cornett asking invasive questions about his PTSD, though it is not clear whether he told Ms. Brown the medical condition at issue. Ms. Brown instructed him to submit doctor's notes and notice of medical appointments directly to HR, but Mr. Cornett was angry about not knowing his schedule.

Ms. Douglas explained that FMLA materials were in the handbook and training materials to notify employees of their rights. Because Mr. Peaslee was a supervisor, he had additional training and was responsible for posting FMLA information in the trucks he was responsible for. Mr. Peaslee did not expressly invoke the FMLA in any discussions about needing accommodation to attend his therapy and other medical appointments.

Mr. Peaslee received positive performance evaluations early in his employment. However, by 2015, his performance evaluations indicated that he needed improvement. A performance evaluation dated September 22, 2015, provides the following "specific areas needing improvement." "The employee needs to work on getting his paperwork turned in without follow up from management. He also needs to strive on checking his CP-Unit Drivers more often. There has been improvement in the employee's performance recently and it needs to continue." (Sept. 2015 Performance Evaluation) (Document 45-4.) Mr. Peaslee indicated that his workload increased, in part because CCC did not hire a relief supervisor after he was assigned a permanent supervisor position, and he sometimes worked 24 hours straight. He and his wife both recalled very frequent telephone calls, usually from Mr. Cornett, which Mr. Peaslee felt were unnecessary.

In late June 2016, Ruth Lanier, an HR employee, called Mr. Peaslee to discuss his daily work schedule. In an email to Ms. Brown recounting the conversation, she states that he refused

to provide more detail, saying he "does not have time to sit down and detail every hour of his day, down to when he plans to take a shit." (June 22, 2016 Email, R. Lanier to J. Brown) (Document 45-13.) He declined to provide any information about what he does in his personal time, and expressed frustration with his workload. Mr. Peaslee agreed that the email accurately reflected the conversation, though he emphasized that Ms. Lanier, and CCC management generally, frequently encroached into his personal affairs and personal time, including intrusive questioning regarding his medical appointments. CCC fired Mr. Peaslee on June 28, 2016, purportedly for insubordination and poor work performance. Ms. Douglas testified that it was her decision to terminate his employment because of his insubordination and lack of cooperation with CCC's attempts to improve his performance.

Mr. Peaslee's complaint lists the following causes of action: Count One – Interference with FMLA rights; Count Two – Retaliation for Exercising FMLA Rights; Count Three – Disability Discrimination under the West Virginia Human Rights Act; Count Four – Invasion of Privacy; and Count Five – Retaliatory Discharge.

**STANDARD OF REVIEW**

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v.*

*Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish

6

the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

## DISCUSSION

### A. Count One – Interference with FMLA Rights

CCC argues that it is entitled to summary judgment as to Count One because Mr. Peaslee did not provide adequate notice of his need for FMLA leave. It contends that it was unaware that Mr. Peaslee suffered from PTSD, that his frequent medical appointments were due to PTSD, or that his doctor recommended prolonged exposure therapy requiring regular weekly appointments. Mr. Peaslee contends that he informed his direct supervisor, Mr. Cornett, as well as other management employees, that he had PTSD, and explained to Mr. Cornett that he had frequent medical appointments because of his PTSD. He argues that CCC interfered with his ability to take intermittent leave for therapy appointments by failing to provide FMLA notice and by directing or pressuring him to cancel appointments.

As relevant to this case, the FMLA provides protection for employees who take leave for family or medical reasons. 29 U.S.C. § 2615(a)(1) states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." "To make out an "interference" claim under the FMLA, an employee must thus demonstrate that (1) he is entitled to an FMLA benefit; (2) his employer interfered with the provision of that benefit; and (3) that interference caused harm." *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 427 (4th Cir. 2015). FMLA regulations permit intermittent leave, or "leave taken in separate blocks of time due to a single qualifying reason,"

including for occasional medical appointment relating to a single condition. 29 C.F.R. § 825.202 (a)–(b). Employers are required to provide individual notice of an employee's FMLA eligibility "when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason." 29 C.F.R. § 825.300(b)(1); *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 301 (4th Cir. 2016). "[T]he FMLA does not require [employees] to specifically invoke its protection in order to benefit from it," but instead requires employers to provide information and protections for employees when the employer becomes aware of the FMLA-qualifying circumstance. *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 293 (4th Cir. 2009).

The parties do not dispute that Mr. Peaslee was an eligible employee. The Court finds that PTSD may constitute a serious medical condition, and Mr. Peaslee has produced evidence indicating that intermittent leave[2] to permit him to attend regular therapy appointments was medically necessary. The dispute here centers on whether Mr. Peaslee adequately notified CCC of his need for FMLA leave, and whether CCC interfered with that leave. Mr. Peaslee has produced evidence[3] that he informed at least two management employees that he suffered from PTSD and required therapy. Mr. Cornett, his direct supervisor, was informed of his PTSD, but, according to Mr. Peaslee's testimony, continually pressured him to cancel appointments. Mr. Peaslee complained to HR and to the Chief Operating Officer, Ms. Douglas, that he was having difficulty attending his medical appointments. Mr. Peaslee also consistently scheduled medical appointments on a weekly basis throughout his more than four years of employment with CCC.

---

2 The parties have not addressed the nature of the "leave" involved in this case. It appears from the record that Mr. Peaslee worked a flexible schedule from home, and his medical appointments did not reduce the total number of hours he worked. He simply needed to be unavailable to CCC for the approximately one hour per week of his therapy appointment.

3 CCC suggests that the Plaintiff's own testimony should somehow be disregarded because it is "self-serving." Differing accounts of events and conversations are, of course, factual disputes that must be resolved by a jury if they are material.

Thus, a jury could find that Mr. Peaslee notified CCC of his need for intermittent leave for a serious health condition.

Mr. Peaslee has also produced evidence that CCC interfered with his ability to take FMLA leave and that he was prejudiced by that interference. Both CCC's failure to provide him with individualized notice and CCC's repeated pressure to cancel or reschedule therapy appointments, if credited by a jury, could constitute interference. He testified that his PTSD caused him to struggle in social situations and to be "on edge" when he's "out and about." (Peaslee Depo. at 174::4-8.) A reasonable jury could infer that his inability to attend therapy appointments, including completing the prolonged exposure therapy program recommended by his doctor, contributed to his struggles at work, as well as other damages. Accordingly, the Court finds that CCC's motion for summary judgment as to Count One should be denied.

B. *Count Two – Retaliation for Exercising FMLA Rights*

CCC again argues that it was not aware that Mr. Peaslee had a medical condition that would trigger FMLA leave, and therefore cannot succeed on a retaliation claim. It further argues that the Plaintiff has no evidence that his termination was related to his exercise of FMLA rights. Even if the Plaintiff could set forth a *prima facie* retaliatory discharge case, CCC argues that it has produced a legitimate reason for his termination, i.e., his poor performance evaluation and insubordination. Mr. Peaslee argues that he did notify CCC of his PTSD, and his frequent doctor's appointments should also have put CCC on notice that he had a serious, chronic condition. He argues that he was fired directly after an exchange involving the scheduling of his medical appointments, an exchange that took place after escalating problems with scheduling his appointments. He argues that the decline in his performance, as well as his insubordination, were

indicative of his PTSD and his need for leave for treatment. Mr. Peaslee further argues that his reaction to the invasive requests for information was reasonable and justified.

To establish a prima facie case of retaliation, a plaintiff must prove that "(1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal link between the two events." *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015) (internal quotation marks omitted). "FMLA retaliation claims may rest on circumstantial evidence evaluated under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016). Under that framework, after the plaintiff establishes a prima facie case, the employer may proffer a legitimate, non-retaliatory reason for the adverse employment action. The burden then shifts back to the plaintiff to demonstrate that the proffered explanation is pretextual. *Id.* However, "[t]he FMLA does not prevent an employer from terminating an employee for poor performance, misconduct, or insubordinate behavior," "even where that behavior is potentially tied to a medical condition." *Id.* at 304-05.

*Vannoy* is particularly instructive here: in that case, the plaintiff suffered from severe depression, and his doctors suggested a thirty-day inpatient treatment program. His employer approved leave, but did not supply him with FMLA notice, and he went back to work after a short absence without completing treatment. The plaintiff took unscheduled absences, including during a work trip, and failed to complete a performance improvement plan. His employer terminated him, citing his unscheduled absences and insubordination. The Fourth Circuit found that summary judgment was not appropriate with respect to an interference claim, because notification

of the plaintiff's FMLA rights might have led him to take approved leave and obtain treatment that would have prevented the subsequent performance issues. However, the Fourth Circuit concluded that the employer was entitled to summary judgment with respect to the retaliation claim and a related ADA claim, because the evidence in the record overwhelmingly supported the employer's explanation for the termination.

Similarly, in this case, Mr. Peaslee has set forth a prima facie case for retaliation based on the timing of his termination amidst ongoing problems with his efforts to take intermittent leave for his therapy appointments. CCC has put forth a legitimate, non-discriminatory reason for his termination: his declining performance, documented in a performance review dated several months before his termination, and his insubordination. Mr. Peaslee admitted during his deposition that he was insubordinate and unprofessional in his conversation with Ms. Lanier, though he also faulted her and CCC for interference with his attempts to obtain treatment and invasive questioning. He also agreed that his performance had declined. Both the insubordination and the decline in performance may have been related to his PTSD, and, by extension, CCC's interference with his treatment. However, as found in *Vannoy*, Mr. Peaslee must produce evidence that his termination was motivated by retaliatory animus due to his attempt to exercise his FMLA rights, rather than due to his performance and insubordination. Mr. Peaslee has not produced evidence of retaliatory animus beyond his own speculation. There is no evidence in the record of any CCC agent suggesting that he was fired because of his frequent medical appointments, nor is there evidence that CCC retained other employees who had a similar decline in performance and/or incident of insubordination. Accordingly, the Court finds that no

reasonable jury could find that Mr. Peaslee's termination was retaliatory, and CCC's motion for summary judgment should be granted as to Count Two.

### C. Count Three – State Disability Discrimination

CCC argues that PTSD does not constitute a disability for purposes of the West Virginia Human Rights Act (WVHRA), at least in this case, because there is no evidence that it substantially limits Mr. Peaslee's major life activities. It further argues that it was unaware that he suffered from PTSD, and so there could not be a relationship between any disability and his termination. The Plaintiff responds that other courts have concluded that PTSD constitutes a serious disability, and the evidence supports a finding that it interfered with his ability to work. He further argues that CCC's asserted reason for firing him is pretextual.

The WVHRA prohibits employers from discriminating based on disability. W.Va. Code § 5-11-9(1). It defines a disability as: "A mental or physical impairment which substantially limits one or more of such person's major life activities. The term 'major life activities' includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." W.Va. Code § 5-11-3(m)(1). West Virginia applies a framework similar to the *McDonell Douglas* burden-shifting described *supra* for determining whether an adverse employment action was motivated by discriminatory intent. *Calef v. FedEx Ground Packaging Sys., Inc.*, 343 F. App'x 891, 898 (4th Cir. 2009) (unpublished).

Mr. Peaslee has supplied evidence that he suffered from PTSD, and that his PTSD interfered with his ability to work, particularly without regular treatment. However, for the reasons outlined above, the Court finds that he has not supplied sufficient evidence to permit a jury

to find that CCC's proffered reason for his termination was pretextual. Accordingly, the Court finds that CCC's motion for summary judgment should be granted as to Count Three.

### D. Count Four – Invasion of Privacy

CCC argues that Mr. Peaslee has not presented evidence, beyond his own statements, that CCC requested detailed health information, or that such information was requested with the intent of intruding on his personal affairs. CCC further points out that it was justified in seeking some information about Mr. Peaslee's health conditions when he requested time off. Mr. Peaslee argues that emails reflecting repeated requests for information, as well as his own testimony, suffice to defeat summary judgment.

The West Virginia Supreme Court has established the following categories of invasion of privacy: "(1) an unreasonable intrusion upon the seclusion of another; (2) an appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that unreasonably places another in a false light before the public." Syl. Pt. 8, *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 74 (W. Va. 1983); Syl. Pt. 6, *Tabata v. Charleston Area Med. Ctr., Inc.*, 759 S.E.2d 459, 461 (W. Va. 2014). The allegations here involve an unreasonable intrusion upon seclusion. Courts in West Virginia have generally adopted the Restatement (Second) of Torts § 652B for claims of intrusion upon seclusion. *See, e.g.*, *Ghafourifar v. Cmty. Trust Bank, Inc.*, No. 3:14-CV-01501, 2014 WL 4809782, at *14 (S.D.W. Va. Aug. 27, 2014) (Eifert, M.J.) *report and recommendation adopted*, No. 3:14-CV-01501, 2014 WL 4809794 (S.D.W. Va. Sept. 26, 2014); *Bourne v. Mapother & Mapother, P.S.C.*, 998 F. Supp. 2d 495, 508 (S.D.W. Va. 2014) (Faber, J.); *Harbolt v. Steel of W. Virginia, Inc.*, 640 F. Supp. 2d 803, 817 (S.D.W. Va. 2009) (Chambers, J.). The Restatement provides: "One who intentionally intrudes,

physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (1977).

Mr. Peaslee testified that Mr. Cornett asked specific questions about his medical conditions and treatment without indicating that those questions were work-related. He said that he complained about the intrusive questions to CCC's HR consultant. Mr. Peaslee also produced an email he sent to Mr. Cornett, saying that he would not provide a list of doctor appointments. Mr. Peaslee has not provided evidence detailing the exact nature or content of the allegedly intrusive questions, the frequency of the questions, or whether CCC actually obtained personal medical information. An employer may reasonably make some inquiries into an employee's medical conditions that result in absences or unavailability for work, such as requiring a doctor's note. In addition, the record indicates that Mr. Peaslee refused to provide information he was uncomfortable sharing. Mr. Peaslee has not pointed to case law, nor has the Court identified case law, suggesting that simply asking invasive questions constitutes an invasion of privacy. In short, the Court finds that Mr. Peaslee has not met his burden of producing evidence sufficient to permit a jury to find in his favor on the invasion of privacy claim. Accordingly, CCC's motion for summary judgment should be granted as to Count Four.

### E. Count Five – Retaliatory Discharge

CCC argues that it is entitled to summary judgment as to Mr. Peaslee's retaliatory discharge claim for the same reasons it argued for summary judgment as to the other counts. It also argues that the plaintiff failed to identify the public policy CCC allegedly violated by discharging him. Mr. Peaslee notes that his complaint, including paragraphs cited in CCC's brief, alleges that his

termination violated the WVHRA and the FMLA. He cites case law permitting retaliatory discharge claims based on both statutes. Mr. Peaslee further argues that he has produced sufficient evidence that his discharge was due to his disability and his eligibility for FMLA leave.

Under West Virginia precedent, "[t]he rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge." Syl. Pt. 1, *Harless v. First Nat. Bank in Fairmont*, 246 S.E.2d 270, 271 (W. Va. 1978). This Court has previously held that "the FMLA provides a substantial public policy that could support a West Virginia common law claim for retaliatory discharge in violation of public policy." *Vandevander v. Verizon Wireless, LLC*, 149 F. Supp. 3d 724, 729 (S.D. W. Va. 2016) (Chambers, C.J.) Although the Court finds that Mr. Peaslee adequately pled the public policy at issue, for the reasons stated above, the Court finds that he has not produced evidence that would permit a reasonable jury to find that his discharge was because of his disability or his need for FMLA leave, rather than his performance and insubordination. Therefore, CCC's motion for summary judgment should be granted as to Count Five.

## CONCLUSION

Wherefore, after careful consideration, the Court **ORDERS** that the *Defendant Citizens Conservation Corps, Inc.'s Motion for Summary Judgment* (Document 45) be **DENIED** as to Count One and **GRANTED** as to Counts Two, Three, Four, and Five.

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record and to any unrepresented party.

ENTER: January 4, 2018

_____
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA